**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **JASON NEEDLEMAN and** | § | |
| **JOSH NEEDLEMAN as Trustees and** | § | |
| **Beneficiaries of the 1998 Needleman** | § | |
| **Irrevocable Trust,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 3:03-CV-1955-L** |
| | § | |
| **JOHN HANCOCK LIFE INSURANCE** | § | |
| **COMPANY,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the court are Defendant John Hancock Life Insurance Company's Motion for Summary Judgment, filed June 3, 2005; Defendant's Motion to Exclude Testimony of Plaintiffs' Expert Witnesses, filed June 3, 2005; and Plaintiffs' Motion to Realign for Trial, filed August 1, 2005. After careful consideration of the motions, responses, replies, briefs, appendices, competent summary judgment evidence, record, and applicable law, the court **grants** Defendant John Hancock Life Insurance Company's Motion for Summary Judgment; **overrules as moot** Defendant's Motion to Exclude Testimony of Plaintiffs' Expert Witnesses; and **denies as moot** Plaintiffs' Motion to Realign for Trial.

**I.      Procedural and Factual Background**

Jason Needleman and Josh Needleman ("Plaintiffs") filed this action in Probate Court Number 2, Dallas County, Texas on July 28, 2003. Plaintiffs allege that John Hancock Life Insurance Company ("John Hancock" or "Defendant") breached its contract or policy of insurance when it denied Plaintiffs' claim for policy benefits on a $4,000,000 life insurance policy on the life

of Plaintiffs' father Michael Needleman ("Needleman").  Defendant removed this action to federal

court on August 29, 2003.  The court now sets forth the facts on which it relies to rule on

Defendant's summary judgment motion.  In setting forth these facts, the court applies the standard

set forth in the following section.

On January 17, 2001, John Hancock issued a $4,000,000 life insurance policy ("Policy") for

the life of Needleman that contained the following provision:

> **20.    Suicide**
>
> If the Insured commits suicide, while sane or insane, within 2 years
> from the Date of Issue, the policy will terminate on the date of such
> suicide and we will pay (in place of all other benefits, if any) an
> amount equal to the premiums paid less the amount of any
> indebtedness on the date of death and less any Withdrawals under
> Section 10.  If the Insured commits suicide, while sane or insane,
> after 2 years from the Date of Issue and within 2 years from the
> effective date of any increase in the Death Benefit resulting from any
> payment of premium we are authorized to refuse under Section 6, the
> benefits payable under the policy will not include the amount of such
> Death Benefit increase but will include the amount of such premium,
> less the amount of any indebtedness on the date of death and any
> Withdrawals applicable, to such Death Benefit increase.

Defendant's App. at 12.  Plaintiffs, as Trustees and Beneficiaries of the 1998 Needleman Irrevocable

Trust, were named as beneficiaries under the Policy.

On May 31, 2002, Needleman died of a gunshot wound to the chest.  The Dallas County

Medical Examiner concluded that Needleman's death was self-inflicted and ruled it a suicide.

Needleman was 62 years old at the time of his death.

In the months prior to his death, Needleman experienced certain business losses and suffered

hip and knee injuries.  As a result, Needleman became depressed. He sought help from his physician,

Dr. Robert Myers, on May 22, 2002.  Dr. Myers asked Needleman whether he had thoughts of

suicide, and Needleman stated that he did not.  Dr. Myers prescribed an antidepressant, Effexor, a selective serotonin reuptake inhibitor (SSRI).[1]  Dr. Myers also advised Needleman to see a psychiatrist.  Due to Needleman's intolerance to Effexor, Dr. Myers switched him to Zoloft, also known as sertraline, another SSRI antidepressant.  Needleman began taking Zoloft a week prior to his death.

On May 26, Mrs. Patricia Needleman, asked her friend, psychologist Flo Weideman, to speak with Needleman at their home.  As a result of the meeting, Dr. Weideman advised Mrs. Needleman to lock up the guns in the house.  Mrs. Needleman locked the guns in the study.

On May 28, Needleman was examined by Dr. Frank Cody.  Dr. Cody diagnosed Needleman as depressed and told him to increase his dosage of Zoloft.  In the early morning hours of May 30, Mrs. Needleman took Needleman to the emergency room at Presbyterian Hospital, as he was anxious, having trouble breathing, and his gums were swollen.  He was diagnosed with an acute allergic reaction to Zoloft and was instructed to stop taking it.

Later that day, Needleman saw Dr. Janet Collins, who diagnosed him with anxiety disorder and switched him to the antidepressant Paxil.  She also prescribed Restoril to help him sleep.  Needleman told Dr. Collins that he was not suicidal.  It is unknown if Needleman ever took Paxil.

On May 31, Mrs. Needleman arrived home at approximately 4:00 p.m. to find Needleman sitting on a pillow in an empty bathtub holding a .357 Magnum revolver to his head.  Mrs.

---

[1]SSRIs "serve to ameliorate depression by selectively repressing the reuptake of serotonin in the brain, which in turn is believed to boost serotonin and dopamine levels."  Defendant's App. at 424. "Serotonin" is an organic compound found in human tissue, especially the brain, and active in the "stimulation of the smooth muscles, transmission of impulses between nerve cells, and regulation of cyclic body processes." Stedman's Medical Dictionary 755 (1995).  "Dopamine" is an organic compound that transmits nerve impulses in the brain "and is essential to the normal functioning of the central nervous system." *Id.* at 240.

**Memorandum Opinion and Order- Page 3**

Needleman described him as crying and red in the face. He told her, "I wanted to do this before you got home." Defendant's App. at 150, Patricia Needleman Deposition at 179. Mrs. Needleman sat in the bathroom with her husband, as he moved the gun back and forth from his head to his chest, and repeatedly cocked the trigger (three to four times). When the gun was pointed at his head, Needleman had his finger on the trigger. When the gun was pointed at his chest, Needleman had his thumbs on the trigger, or inside the trigger guard. After approximately 45 minutes, the gun discharged, and Needleman shot himself in the chest. Mrs. Needleman called 911, and Needleman was transported to Parkland Hospital, where he was pronounced dead.

A police investigation reported that Needleman's death was a suicide. The Dallas County Medical Examiner's office investigated the death, conducted an autopsy, and ruled the death a suicide in the autopsy report.[2] The medical examiner's investigation report states, "The deceased has a [history] of depression and placed a weapon in his mouth today and threatened suicide per his wife. Prior attempts were indicated via drug overdose." Defendant's App. at 45. The toxicology report revealed that Needleman had the following drugs in his blood:  0.09 mg/L demethylsertraline and 0.04 mg/L sertraline, which are antidepressants.[3] The conclusions by the medical examiner and the police investigation that Needleman's death was a suicide were never contested.

_____

[2]Plaintiffs argue that the death certificate and coroner's report and affidavit are improper summary judgment evidence. They contend that Texas courts have held that a coroner or Justice of the Peace's opinion regarding the manner of death is just an opinion. *See Employers Nat'l Life Ins. Co. v. Brewer,* 563 S.W.2d 863, 865 (Tex. Civ. App. – Waco 1978, writ ref'd n.r.e.); *Price v. American Nat'l Ins. Co.,* 113 S.W.3d 424, 429 (Tex. App. – Houston [1st Dist.] 2003, no pet.). They further argue that, pursuant to the Texas Health and Safety Code, death certificates are admissible as prima facie evidence only with regard to the *facts* contained therein, and not the opinion. Tex. Health & Safety Code Ann. § 191.052 (Vernon 2005). The court agrees that the ruling by the medical examiner that Needleman's death was a suicide is just an opinion, and does not conclusively establish suicide as the cause of death.

[3]Defendant asserts that this indicates a small amount of Zoloft, but points to no further evidence regarding the effects, if any, of this amount of antidepressant.

**Memorandum Opinion and Order- Page 4**

Plaintiffs contend that Defendant breached its contract or policy of insurance by denying

their claim based on the suicide clause in the policy. They maintain that Needleman did not intend

his death, and that Defendant bears the burden to rebut the presumption that Needleman's death was

not a suicide, but was his intentional act.  They argue that Needleman was never suicidal prior to

taking Zoloft.  They further assert that "for years it has been known in science and in law that, for

a 'small vulnerable subpopulation' of patients, [SSRI antidepressants] can trigger self-destructive

acts."[4]  First Amended Complaint at 4.  Plaintiffs also allege that there is evidence that the actual

discharge of the gun was accidental.

Defendant filed its motion for summary judgment on June 3, 2005.  Defendant contends that

Needleman purposely committed the acts leading to his death, and, therefore, Plaintiffs are excluded

from benefits coverage under the clear language of the Policy's suicide clause.  Defendant asserts

that: (1) suicide does not require proof of intent; (2) Needleman committed a purposeful act of self-

destruction; (3) Plaintiffs fail to raise a genuine issue of material fact regarding accidental death; and

(4) claims of SSRI-induced violence have been rejected by the courts for lack of proof of causation.

## II.    <u>Summary Judgment Standard</u>

Summary judgment shall be rendered when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v.*

*Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact

is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the

_____

[4]Plaintiffs cite *Tobin v. SmithKline Beecham Pharmaceuticals*, 164 F.Supp.2d 1278 (D.Wy. 2001),
to support this contention.

**Memorandum Opinion and Order- Page 5**

nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986); *Ragas,* 136 F.3d at 458.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  *Matsushita,* 475 U.S. at 586.  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Ragas,* 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.; see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied,* 506 U.S. 832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson,* 477 U.S. at 248.  Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to

establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322-23.

## III.   Analysis

### A.   Suicide and Proof of Intent

Defendant maintains that, under the facts of this case, suicide does not require proof of intent. In support, Defendant cites to *Aetna Life Ins. Co. v. McLaughlin*, 380 S.W.2d 101 (Tex. 1964), where the Texas Supreme Court followed the majority rule as to the construction of a suicide clause in an insurance policy. *Id.* at 104. The majority rule is that

> [F]or an act to be "suicide, sane or insane," it is not necessary for the decedent to have realized the physical nature or consequences of his act, nor that he have a conscious purpose to take his life. If the act be one which would be regarded as suicide in a sane person, the loss occasioned thereby would come within the exclusion, regardless of whether the insured decedent realized or was capable of realizing that such act would cause his death, and regardless of whether he was capable of entertaining an intention to kill himself.

*Id*. at 102 (citation omitted). Defendant maintains that Needleman's actions of pointing a gun at his heart and pulling the trigger "clearly would be regarded as suicide if a sane person committed them," and thus his death is a suicide under the Policy, "regardless of whether he possessed intent to take his own life or was capable or incapable of forming it." Defendant's Brief at 14-15.

Plaintiffs counter that determining what constitutes "suicide" is a fact question. Plaintiffs maintain that in Texas there is a presumption against the theory of suicide, and that "this '"presumption places  the burden of producing conclusive evidence showing suicide on the insurance company.'" Plaintiffs' Response at 20 (citing *Price v. American Nat'l Ins. Co.,* 113 S.W.3d 424, 429 (Tex. App. – Houston [1st Dist.] 2003, no pet.). They contend that the issue in this case is whether Needleman intentionally or accidentally pulled the trigger, which they assert is a

question of fact.  Plaintiffs cite *Langlotz v. Citizens Fidelity Ins. Co.*, 505 S.W.2d 249 (Tex. 1974),[5]

to support their position.   Plaintiffs argue that, as *Langlotz* defined "suicide" as the "intentional"

taking of one's own life,[6] Defendant's motion should be denied, as it has not met its burden of

showing that Needleman intended to take his own life.

Defendant acknowledges that it has the burden of proof on its affirmative defense of the

suicide exclusion to the Policy, and that there is a presumption in Texas law against suicide.

Defendant maintains, however, that such a presumption has no weight as evidence once it has been

rebutted.  *See Prudential Ins. Co. v. Krayer*, 366 S.W.2d 779, 780 (Tex. 1963).  Defendant contends

that Plaintiffs have no probative evidence supporting a nonsuicide hypothesis, such as an accident,

and the only reasonable inference that can be drawn from all of the evidence is that Needleman

committed suicide.   Defendant asserts that it is undisputed that Needleman's actions were

intentional.  Defendant further argues that under Texas law, suicide does not require that Needleman

"realized the physical nature or consequences of his act, nor that he have had a conscious purpose

to take his life."   Defendant's Reply at 5-6 (citing *McLaughlin*, 380 S.W.2d at 102.).   Defendant

points out that Needleman's state of mind at the time he committed the act is irrelevant, and the issue

is whether he intentionally or accidentally pulled the trigger.

---

[5]In *Langlotz*, the question before the court was whether there was some evidence to support the jury's verdict that the insured did not commit suicide.  *Langlotz*, 505 S.W. 2d at 250.  The court noted that the insured was intoxicated and was in the process of cleaning a gun when the gunshot occurred.  The court also noted that the definition of "suicide" given to the jury was the "intentional taking of the life of the insured."  The court further noted that there was no objection to this definition.  The court concluded that a jury could reasonably assume, based on the circumstances, that the shooting was not a suicide.  *Id*. at 250-51.

[6]The court disagrees with Plaintiffs' contention that *Langlotz* defines "suicide" as the intentional taking of one's life; rather, the *Langlotz* court stated that this was the definition given to the jury, and that there was no objection to the definition.  This definition, therefore, was the standard used by the jury in the *Langlotz* case.  This court concludes the appropriate standard is that announced by the *McLaughlin* court as recited *supra*.

**Memorandum Opinion and Order- Page 8**

The court agrees. "[T]he intent element (or words of similar import) is essential and necessary to distinguish a *suicide* from a *pure accident* at one's own hand or act." *Southern Farm Bureau Life Ins. Co. v. Dettle*, 707 S.W.2d 271, 274 (Tex. App. – Amarillo 1986, no writ) (emphasis added). Thus Needleman's intent would only be relevant if there was evidence that he accidentally shot himself. As the Texas Supreme Court explained in *McLaughlin*, based on the facts of that case:

> [T]he true issue in this case was whether McLaughlin met his death by lunging or throwing himself in front of the bus or by accidently stumbling and falling in front of the vehicle. If he committed the act, – placing himself in front of the bus, – his beneficiary cannot recover, regardless of whether he appreciated the physical consequences of his act or not.

*Id.* at 105. Thus, the requisite intent that must be proved for the suicide exclusion clause to apply here is Needleman's intent to commit the acts that caused his death.

The evidence in this case necessarily establishes that Needleman intended the actions that took his life. Needleman got into a bathtub with the gun. He alternately held the gun to his head and his chest. When Needleman held the gun to his head, his finger was on the trigger. When he held the gun to his chest, both thumbs were on the trigger, or inside the trigger guard. One of the most telling facts is that Needleman told his wife, "I wanted to do this before you got home." Thus, the court determines that Needleman committed the acts that took his life; he intended to commit those acts; his actions would be regarded as suicide in a sane person; and therefore, Plaintiffs are excluded by the suicide clause in the Policy from recovering the death benefits, regardless of whether Needleman realized or was capable of realizing that his actions would cause his death, and regardless of whether he was capable of entertaining an intention to kill himself. Defendant, therefore, did not breach its contract or policy of insurance when it denied Plaintiffs' claim for benefits on the Policy pursuant to the suicide exclusion clause. Plaintiffs have thus failed to raise

a genuine issue of material fact as to this issue.  Accordingly, Defendant is entitled to judgment as a matter of law on this issue.

### B.      Accidental Death

Defendant maintains that Plaintiffs have failed to raise a genuine issue of material fact as to accidental death.  Defendant points out that Mrs. Needleman, the only eyewitness to Needleman's death, testified in her deposition that she did not see Needleman's arm slip, and that there are no facts to suggest that his arm slipped.  Defendant's App. at 153.  Defendant's expert, Richard Ernest, an expert in death investigations and weapons tests, opined that the theory that Needleman's arm slipped on the side of the bathtub is "unlikely" because (1) the gun had several safety mechanisms that make it virtually impossible to discharge without pulling the trigger fully rearward; and (2) the clear muzzle imprint on Needleman's chest indicates that the muzzle was pressed or held in hard contact with his body.  *Id*. at 429-30.  It is Ernest's opinion that "[i]f the elbow of the right arm (shooting hand) had slipped it would have caused the weapon to tip in such a manner as to fire in an upward direction, which is not the directionality of the wound track as described at autopsy."  *Id.* at

430. Ernest further opines that:

> [A] slip of the elbow would have necessitated a lessening of the tight seal in the contact gunshot hole, [and] thus cause a "soft" contact or "near" contact and the deposition of large amounts of gunshot residues (powder burns) where the seal is held tightly.  Neither of these conditions is seen in the autopsy photographs.

*Id.*

Plaintiffs argue that the facts suggest that Needleman discharged the gun accidentally.  They point to the following: (1) three health care professionals determined that Needleman had no suicidal intent; (2) Needleman had a history of "foolhard[ily] discharg[ing] firearms in his own home;"[7]  (3) Needleman was taking medication that caused his hands to tremble two days before his death; (4) Needleman sat in the bathtub for a long time without shooting himself; (5) Needleman moved the gun from head to chest and back again; (6) Needleman had two thumbs in the trigger guard; (7) Needleman's arm was resting on the side of a slippery bathtub; (8) Mrs. Needleman described Needleman's face as going "off somewhere" right before the gun discharged; (9) Mrs. Needleman observed that Needleman's "eyes flew open in wide surprise" when the gun fired; and (10) Needleman had $10 million in insurance coverage for years, and was aware that if he killed himself his sons might not recover the insurance benefits.  Response at 26-27.

As regrettable as the facts are in this case, the court determines that Plaintiffs have not raised a genuine issue of material fact that Needleman's death was an accident.  Plaintiffs produced no competent summary judgment evidence that the discharge of the gun was accidental.  The suggestion that Needleman's elbow slipped, or his shaking hands caused him to pull the trigger, is,

---

[7]Plaintiffs allege that Needleman accidentally discharged his gun on two separate occasions.  On the first occasion, he heard a noise, grabbed his gun and fired it, hitting the stairs.  On the next occasion, he accidently fired the gun while cleaning it.  Plaintiffs' Response at 6.

**Memorandum Opinion and Order- Page 11**

at best, speculation and conjecture.  It is undisputed that Needleman purposely placed the gun against his chest, vocalized his intent to kill himself, and shot himself.[8]  Further, Mrs. Needleman admits that she did not see Needleman's arm slip.  Defendant's App. at 153, Patricia Needleman Deposition at 190-92.  As Plaintiffs' expert, Dr. James Adcock, was not present, and Mrs. Needleman did not see her husband's arm slip, the inference drawn by Dr. Adcock that the arm slipped is unreasonable, impermissible, and does not raise a genuine issue of material fact as to whether the discharge of the gun was accidental.  Likewise, Mrs. Needleman's contention that it was an accident, because such an act by Needleman was "so uncharacteristic," *id.* at 154, at 195, does not aid Plaintiffs.  Such speculation by Mrs. Needleman does not raise a genuine issue of material fact.  That Plaintiffs observed Needleman's hands tremble two days before his death, likewise does not raise a genuine issue of material fact that the shooting was an accident in light of all the evidence that Needleman intended to shoot himself.  Further, the photographic and forensic evidence does not support the theory that Needleman's arm slipped.

Using the standard established in *McLaughlin*, a sane person's actions of pointing a gun at his chest and pulling the trigger would be regarded as suicide.  Likewise, Needleman's actions are regarded as suicide, regardless of whether he possessed the specific intent to take his own life or was capable or incapable of forming it; or whether he was driven to commit the act by an irresistible foreign impulse or compulsion allegedly created by Zoloft.  *See McLaughlin*, 380 S.W.2d at 102.  As discussed in Section A, *supra*, Needleman intended the acts that caused his death.  While the

---

[8]That Needleman had both thumbs in the trigger guard is additional significant evidence that he intended to pull the trigger and that he did not accidently pull it.  The purpose of a trigger guard is to prevent or minimize the accidental or unintended discharge of a weapon.  When Needleman placed a thumb or finger inside the trigger guard under the circumstances present in this case, the only logical and reasonable inference is that he intended to pull the trigger and fire the gun.

**Memorandum Opinion and Order- Page 12**

circumstances of this case are sad and tragic, the court determines that no basis exists for Plaintiffs'

contention that Needleman's death was an accident.  Plaintiffs have thus failed to raise a genuine

issue of material fact as to this issue.  Accordingly, Defendant is entitled to judgment as a matter of

law on this issue.

### C.      SSRI-induced Suicide

Regarding Plaintiffs' second theory that Needleman's death was SSRI-induced, Defendant

asserts that such theory does not alter the applicability of the suicide clause.  It points out that courts

have "resoundingly rejected claims of SSRI-induced violence because they lack proof of causation."

Brief at 19.[9]  Defendant maintains that there is no scientifically reliable evidence that supports

Plaintiffs' theory that Needleman's suicide was caused by SSRI-induced effects.

Plaintiffs maintain that, contrary to Defendant's contentions, many courts have accepted

scientific testimony about the link between SSRI drugs and suicide.[10]  They also argue that there

is "ample, scientifically reliable, legally admissible, evidence to show the link between Zoloft and

'suicidality' as defined, " and direct the court to their response to Defendant's objection to their

---

[9]Defendant cites Plaintiffs' case against Pfizer in this district, wherein the district judge rejected Plaintiffs' product liability claim against Pfizer.  *See Patricia Needleman, et al. v. Pfizer Inc. and John Doe,* Civil Action No. 3:03-CV-3074-N.  Defendant also cites *Miller v. Pfizer, Inc.,* 196 F. Supp.2d 1095 (D. Kan. 2002), *aff'd,* 356 F.3d 1326 (10th Cir. 2004); and *Motus v. Pfizer, Inc.*, 196 F.Supp.2d 984 (C.D. Cal. 2001), *aff'd,* 358 F.3d 659 (9th Cir. 2004), product liability cases, in which the courts granted summary judgment for Pfizer, holding that the plaintiffs' claims that Zoloft caused the decedents' suicides lacked proof of causation.  Defendant further cites *Miles v. AIG Life Ins. Co.,* 2005 WL 1038668 (E.D. La. April 22, 2005), an ERISA case in which the court granted AIG summary judgment, upholding its denial of benefits because decedent's death was not an accident.

[10]Plaintiffs cite *Tobin v. SmithKline Beecham Pharmaceuticals*, 164 F.Supp.2d 1278 (D.Wy. 2001). Plaintiffs further directs the court to its response to Defendant's *Daubert* objection to Plaintiffs' experts.  The court notes that *Tobin* was a products liability action against the pharmaceutical company, and not an action for insurance benefits, as is this case, and is therefore distinguishable.

**Memorandum Opinion and Order- Page 13**

experts.[11]   Response at 32.   Plaintiffs contend that an FDA panel of scientists has voted overwhelmingly that SSRI antidepressants caused an increased risk of suicidality in children and adolescents. Plaintiffs further contend that, pursuant to the FDA's website,[12] the FDA has requested that manufacturers of SSRI antidepressants add a warning to their labels that a causal role has been established for antidepressants inducing suicidality in pediatric patients.  Plaintiffs contend that as of June 2005, the FDA issued an advisory that adults being treated with antidepressants should be watched for increased suicidal thinking or behavior.

The court determines that Plaintiff's theory that Needleman's death was induced by antidepressants does not change the effect of the suicide clause, or change the nature of Needleman's action so as to render his death an accident rather than a suicide, because his state of mind at the time of the act is irrelevant.  As discussed fully above, Needleman committed the acts that caused his death, and thus the suicide exclusion clause applies in this case.  Regarding Plaintiffs' contention that the antidepressant induced Needleman to commit suicide, such a theory does not impact the law of this state.  The court has reviewed all of the cases submitted by the parties, none of which allowed for the theory of  SSRI-induced suicidality to defeat the suicide exclusion clause of an insurance policy.   Moreover, Plaintiffs acknowledge that the FDA's own study only contends that antidepressants caused an increased risk of suicidal tendencies in *children* (emphasis added by the court); however, there is no such study for adults.

---

[11]The court address the objection to experts in Section IV.

[12]http://www.fda.cov/cder/drug/antidepressants/SSRIlabelChange.htm.

**Memorandum Opinion and Order- Page 14**

IV.   **Defendant's Motion to Exclude Expert Witnesses**

Defendant seeks to exclude the testimony of Plaintiffs' expert witnesses, contending that each of Plaintiffs' three experts fails to satisfy the requirements of *Daubert v. Merrell Dow Pharma., Inc.,* 509 U.S. 579, 587 (1993), which requires expert testimony to be both relevant and scientifically reliable.   In support of its response to Defendant's motion for summary judgment, Plaintiffs submitted excerpts from the depositions and reports of Dr. Joseph Glenmullen, a psychiatrist; Dr. Ronald Maris, a suicidologist; and Dr. James Adcock, a death investigator.

Dr. Glenmullen opines that Needleman's death "was an accident caused by a toxic reaction to antidepressants[.]"  Plaintiffs' Exhibit 10.  He maintains that antidepressant-induced suicidal urges are alien impulses as opposed to the willful intent to die characteristic of true suicides.

Dr. Maris opines that Needleman did not commit suicide, but had a drug induced adverse reaction.  Defendant's App. to its Motion to Exclude at 63.  He contends that  the adverse reaction "compromised Michael's ability to form any suicidal intent, which is a *sine qua non* of suicide." *Id.*

Dr. Adcock issued two reports.  In his first report, he opines that Needleman's depression was exacerbated by Zoloft that "put him in a state of akethesia [sic]."[13]  *Id.* at 178.  In his second report, Dr. Adcock opines that Needleman shot himself in an "equivocal manner (accident versus suicide)."  *Id*. at 192.  He maintains that "there are insufficient indicators that Mr. Needleman had developed the necessary intent to establish a suicide," and the possibility that Needleman's arm slipped off the edge of the bathtub could have easily caused the gun to discharge accidentally.  *Id.*

---

[13]The term "akathisia" is defined as "motor restlessness characterized by muscular quivering and the inability to sit still, often as a result of chronic ingestion of neuroleptic drugs." Stedman's Medical Dictionary 26 (1995).  "Neuroleptic" is a "tranquilizing drug, especially one used in treating mental disorders."  *Id*. at 555.

Defendant maintains that Plaintiffs' experts' opinions are irrelevant, because regardless of what caused Needleman to shoot himself, the Policy excludes suicide committed while sane or insane.   Defendant further contends that the opinions are unreliable, as there is no evidence of general causation establishing that SSRIs cause suicide, and that there is no evidence of specific causation that Needleman's suicide was caused by Zoloft.   Regarding the theory that Needleman's arm slipped on the side of the bathtub, Defendant asserts that this is mere speculation, and there is no evidence supporting this theory.[14]

Federal Rules of Evidence 702 and 703, as interpreted in *Daubert* and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), govern the admissibility of testimony of expert witnesses. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  Accordingly, before allowing expert testimony to be heard or considered in the summary judgment context, a district court must be assured that the proffered witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training or education." *See id.*  A district court should refuse to allow an expert witness to testify, or offer evidence in the summary judgment context, if it finds that the witness is not qualified to testify in a particular field or on a given subject. *See Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999). The issue is whether a

---

[14]The court previously addressed this theory in Section III(B), and finds it unnecessary to further discuss it.

particular expert has "sufficient specialized knowledge to assist the jurors [or trier of fact] in deciding the particular issues. . . ." *Kumho,* 526 U.S. at 156 (internal quotation omitted).

In evaluating the admissibility of exert testimony, the key factors are reliability and relevance. *Daubert,* 509 U.S. at 589 (under Rule 702, expert testimony must be "not only relevant, but reliable"). The relevancy requirement ensures that the expert testimony will actually "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Fed.R.Evid. 401 defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The reliability requirement ensures that the expert testimony is "supported by appropriate validation" and "establishes a standard of evidentiary reliability." *Daubert,* 509 U.S. at 590. This determination requires the court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. To assist the court in this determination, the Supreme Court has suggested that trial courts examine a nonexclusive list of factors including whether a theory or technique has or can be tested, published, subjected to peer review, has or can be subjected to standards controlling its operation, the known or potential rate of error, and whether the theory or technique is generally accepted. *Id.* at 593-94. The Court has also instructed trial courts to "be mindful of other applicable rules," such as Rules 703, 706, and 403, when determining the admissibility of expert testimony. Id. at 595.

*Kumho* stressed that the *Daubert* factors may be relevant to the reliability of experience-based testimony. The overarching goal of *Daubert'*s gatekeeping requirement, however, is to ensure the reliability and relevancy of expert testimony and to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho,* 526 U.S. at 152.  The party offering the expert testimony has the burden of establishing that it is admissible under Rule 702 and the *Daubert-Kuhmo* standard. *See Kumho,* 526 U.S. at 147.

In this case the court need not analyze the reliability of Plaintiffs' expert testimony, as the court determines that such testimony is not relevant to this case.  Moreover, regardless of how well an expert's report is crafted, how eminently qualified an expert is, or how sound the expert's testimony, such report, qualifications, and testimony cannot create liability when none exists.  What an expert opines is irrelevant and quite beside the point if the facts and law do not support liability. *McLaughlin* makes clear that if Needleman's act of shooting himself would be regarded as suicide in a sane person, the insurance benefits are excluded under the suicide exclusion clause, regardless of whether the Zoloft prevented Needleman from realizing that his actions would cause his death, and  "regardless of whether he was capable of entertaining an intention to kill himself." *Id*. at 105. Accordingly, the court would reach the same decision irrespective of its consideration of Plaintiffs' experts' reports and deposition testimony.  The court therefore **overrules as moot** Defendant's Motion to Exclude Testimony of Plaintiffs' Expert Witnesses.

## V.   <u>Plaintiffs' Motion to Realign for Trial</u>

Plaintiffs seek to realign the parties for trial, so that Defendant, who bears the burden of proof of the suicide issue, would present its evidence first.  As the court determines that Defendant is entitled to summary judgment in this case, Plaintiffs' Motion to Realign for Trial is **denied as moot**.

VI.     **Conclusion**

For the reasons herein stated, no genuine issue of material fact exists with respect to Plaintiffs' claim that Defendant breached its contract or policy of insurance when it denied Plaintiffs' claim for benefits pursuant to the suicide exclusion clause in the Policy.[15]   The court therefore **grants** Defendant John Hancock Life Insurance Company's Motion for Summary Judgment.  The court **overrules as moot** Defendant's Motion to Exclude Testimony of Plaintiffs' Expert Witnesses; and **denies as moot** Plaintiffs' Motion to Realign for Trial.  Judgment will issue by separate document as required by Fed. R. Civ. P. 58.

**It is so ordered** this 31st day of March, 2006.

*Sam A. Lindsay*
Sam A. Lindsay
United States District Judge

---

[15]As a final matter, the court addresses Plaintiffs' overemphasis of a statement in the court's order of May 5, 2004, that commented on the parties' proposal to allow the filing of two summary judgment motions.  The court stated, "From the court's perspective, it is better to consider one summary judgment motion, especially when it appears that the matter at issue in the proposed second summary judgment motion would necessarily raise a fact question."  *Id*. at 1.  The court's statement was made prior to the submission of the motion for summary judgment and its review of the briefs, record, competent summary judgment evidence and applicable law.  Plaintiffs take the court's statement out of context, and moreover, the court ultimately granted the parties' request to file two motions. Their reliance on the statement to contend that the court believed a genuine issue of material fact existed is misplaced.

**Memorandum Opinion and Order- Page 19**